**LOEB v. TURNER et al.**
No. 14693.

Court of Civil Appeals of Texas. Dallas.
April 10, 1953.

Phinney, Hallman, Reed & Holley, and Ralph W. Pulley, Jr., all of Dallas, for appellant.

Leake, Henry, Golden & Burrow, Dallas, for appellees.

DIXON, Chief Justice.

This is a suit originally filed by Howard Loeb, appellant here, plaintiff below, owner and operator of Radio Station KRIZ in Phoenix, Arizona, against A. L. Turner and Trinity Broadcasting Corporation, ap-

pellees here, defendants below. Trinity Broadcasting Corporation is the owner and operator of Radio Station KLIF in Dallas, Texas. A. L. Turner is one of its radio announcers. Appellant sought damages and a permanent injunction to restrain appellees from broadcasting accounts of stock car automobile races to be held in Phoenix. At a setting intended originally for a hearing on appellant's application for a temporary injunction, it was agreed that the main case itself would be tried on its merits. This was done. From a judgment for defendants, plaintiff has appealed.

Ernest Mohammed owns and operates South Mountain Speedway in Phoenix, where he promotes the races. On Feb. 11, 1953, Mohammed and appellant entered into a written contract which contains this paragraph:

"1. KRIZ shall have the exclusive right to have telephone broadcast lines installed at South Mountain Speedway and to broadcast therefrom any or all of the racing events of Sunday, February 15, 1953, such rights to apply to radio broadcasting throughout the United States."

The contract also gave appellant an option to broadcast the next three scheduled racing events at South Mountain Speedway.

Sunday, Feb. 15, 1953, had been designated as "Texas Day" at the speedway because one of the well-known participating drivers was from Dallas, Texas. As a result the races were of some public interest in Dallas. The races were duly run and appellant caused a lap by lap description of them to be broadcast over Station KRIZ, which broadcast, not copyrighted, could be heard at all points within the 40-mile radius of Phoenix which marks the limits of the station's broadcasting power. Appellant had obtained a sponsor for his program, Stewart Motor Company of Phoenix, which company paid a valuable consideration to appellant for the advertising it received as sponsor. Somewhere within the 40-mile radius of appellant's broadcast over KRIZ at Phoenix, appellees had stationed an agent who listened to the broadcast, and by long distance phone communicated to appellees' station in Dallas information covering the bare facts, in abbreviated form, pertaining to each race as it was being run. In Dallas the person receiving this information made notes on slips of paper. These notes were handed to A. L. Turner, a talented and experienced announcer, who then referred to the notes to broadcast over Station KLIF at Dallas a recreation of the races. Station KLIF also had a commercial sponsor for its program.

Turner did not rebroadcast KRIZ's program; he presented to his listeners a recreation of the races. A rebroadcast and a recreation are different. The first is an exact reproduction of a program. This is usually accomplished by making a sound recording of the original program and playing the record each time it is desired to rebroadcast the program.

A recreation, on the other hand, though it may be based on actual events, is a dramatization of those events. It may be likened at least in some respects to a historical novel, or to a play, such, for example, as Shakespeare's "Julius Caesar." The great playwright must have borrowed the main theme of his drama from factual accounts, extant in his day, of the life of Caesar. The dramatis personae were not fictitious persons. Caesar, Marc Anthony, Brutus, and Cassius are real persons in history. The main action in the play represents actual happenings—the assassination of Caesar, the behavior of Marc Anthony, the subsequent careers of Brutus and Cassius, the denouement at the battle near Philippi. Nevertheless, the author drew freely on his imagination to fill in the details, and he used such stage effects as were available to him to obtain a semblance of reality, to increase suspense, and to achieve dramatic effect. His production was part factual and part imaginative. So was appellees' recreation of the races, as we understand it from the record.

Appellees' recreation, though not broadcast simultaneously with the happening of events at the race track, was put on the air as soon thereafter as possible—within a few minutes. Moreover, as part of his artistry, the announcer, A. L. Turner, in-

jected a tone of excitement as he narrated the events which had occurred a few minutes before, embellishing his account with details of his own invention and accompanying his words with sound effects which made it seem he was present at the track. In fact, it is his practice when he presents a recreation to pretend that the race is going on right before his eyes. However, at the opening of the program and again at its conclusion, this announcement was made:

"KLIF now brings you (or "You have just heard") a recreated description of the main event stock car automobile race at South Mountain Speedway in Phoenix, Arizona."

Thus listeners who understood the meaning of the phrase "a recreated description" would know the true character of the program.

Appellees' manager testified that Station KLIF had used this type of broadcast for several years and intended to continue to do so in the future.

As we view the case it is not contested that appellees had a right to broadcast that portion of their program which was original and imaginative on the part of Turner, the announcer. The only question before us is whether appellees had a right to incorporate into their broadcast the news which had been picked up a few minutes before from appellant's factual broadcast of the races.

Appellant's nine points on appeal are that the court erred in holding, (1) that appellant had no property right as between himself and appellees; (2) unless appellant was making a live broadcast in Dallas with which appellees' recreation interfered; (3) that a radio broadcast is similar to a platform speech rather than to the publishing of news by newspapers; (4) that appellant could not recover on the principle of unfair competition in Phoenix or in Dallas; (5) that appellant is estopped because he was attempting to monopolize news at its source; (6) that appellant failed to make out a prima facie case; (7) that appellant abandoned any property right he may have had in the Dallas listening public by failing to broadcast in Dallas; (8) that appellant suffered no damage that would warrant an injunction; and (9) that appellant was attempting to suppress the dissemination of news, thus violating the right of freedom of speech.

South Mountain Speedway is a privately owned and controlled race course. Each spectator before being admitted is required to purchase a ticket which in effect grants him a license to attend and watch the races, but expressly provides that he shall not take pictures or relay news of what he sees while witnessing the racing events. The owner may rightfully admit or exclude such persons as he wishes. He may also control his property with reference to who may or may not install telephone facilities within its confines. He may enter into a contract granting to a broadcasting station the exclusive privilege of installing facilities on his property and broadcasting from a point located on his property. Persons doing so against his wishes are trespassers. Terrell Wells Swimming Pool v. Rodriguez, Tex.Civ. App., 182 S.W.2d 824; Southwestern Broadcasting Co. v. Oil Center Broadcasting Co., Tex.Civ.App., 210 S.W.2d 230. We think the contract entered into between appellant and the owner of South Mountain Speedway was valid.

The difficulty in the case before us is that the record contains no evidence that appellees' agent was within the confines of South Mountain Speedway when he used long distance telephone facilities to transmit to Dallas some of the facts concerning the races. The record shows only that he listened to appellant's broadcast somewhere within a 40-Mile radius of the Speedway, which of course he had a perfect right to do. We think he had a right then, certainly unless he was on the Speedway property, to inform his fellow agent at Dallas of "the bare facts in abbreviated form" pertaining to the races.

The actual happenings of each day, including sporting events, become part of the facts of history immediately upon their happening. News of them cannot be copyrighted; nor, so far as the public is con-

cerned, can the news itself become the subject of a property right belonging exclusively to any person. To hold otherwise would be to contravene our constitutional guaranty of freedom of speech and freedom of the press. An opinion relied upon by appellant contains the statement that the framers of our Constitution in empowering Congress to pass copyright laws did not intend "to confer upon one who might happen to be the first to report a historic event the exclusive right for any period to spread the knowledge of it." The same opinion also contains this statement: "* * * the news of current events may be regarded as common property." International News Service v. Associated Press, 1918, 248 U.S. 215, 39 S.Ct. 68, 71, 63 L.Ed. 211. We do not consider it necessary to cite an extended list of authorities in support of these fundamental principles.

However, the above named case does hold that a commercial news-gathering agency may acquire a quasi-property right in fresh news items it has collected at great labor and expense as against a rival news-gathering agency (but not against the public) which seeks to "pirate" its columns and news bulletins. The court does not attempt to say just how long news remains fresh. Moreover, it restricts the effect of its injunction to the immediate area within which the two agencies and their members are in actual competition. It concedes that one agency may take "tips" as to the news from another agency. The holding, though by the Supreme Court of the United States, is not necessarily binding upon the State courts of Texas, or of any other state. Erie Railway Co. v. Tompkins, 1937, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Moreover, in a subsequent case the Supreme Court held that the Associated Press was operating as a monopoly in restraint of trade. Exclusive news contracts with the Associated Press were stricken down. Associated Press v. United States, 1945, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2018. We do not consider that in the case before us International News Service v. Associated Press, supra, is controlling.

■ We are of the opinion that after appellant broadcast the events of the races, the facts so communicated gratuitously to the public became news available for comment and use, so far as any property right of appellant was concerned, by the public generally and individually, including appellees. By sending out the news over the airways (which are publicly owned), appellant in effect published the information he had collected. Under our law, as a result of such publication the material became available to everyone, since it was uncopyrighted. Vernon Abstract Co. v. Waggoner Title Co., 49 Tex.Civ.App. 144, 107 S.W. 919. Thereafter an attempt to obtain exclusive control of the dissemination of news would violate the law against monopolies in restraint of trade. Lorain Journal Co. v. United States, 1951, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162; Associated Press v. United States, 1945, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2018.

■■ Appellant contends that he is entitled to judgment on the ground of unfair competition. However, the record fails to disclose that there is any competition between the parties, or that appellant's business is being interfered with in any way by appellees' activities. We take judicial notice of the fact that Phoenix, Arizona is more than a thousand miles from Dallas, Texas. Appellant's broadcasts cover only a radius of forty miles from Phoenix. In fact it is undisputed that appellant has made no attempt to compete with appellees in Dallas, nor have appellees made any attempt to compete with appellant in Phoenix. Under these circumstances the principle of unfair competition is not applicable. A. B. C. Stores v. T. S. Richey & Co., Tex.Civ. App. 1924, 266 S.W. 551, reversed on other grounds, Tex.Com.App., 280 S.W. 177; Gilmore v. Sammons, Tex.Civ.App. 1926, 269 S.W. 861 (NER).

In a recent case, Burge v. Dallas Retail Merchants Association of Dallas, 257 S.W. 2d 733, we held that under some circumstances the rule of unfair competition will apply though the parties were not engaged in the same kind of business. In that case the parties were both operating in Dallas. There was evidence that the close similarity in their names had led to confusion in the public mind which had caused serious in-

terference with the plaintiff's business. No such situation presents itself in the instant case.

Finding no reversible error, we affirm the judgment of the trial court.

Affirmed.